**In the**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00177-CR**
_____

**MARK ANTHONY BRISENO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause No. 20-01-00059-CR**

**MEMORANDUM OPINION**

A Montgomery County grand jury indicted Mark Anthony Briseno for murder after he shot and killed his girlfriend, Daria Khoussinov. A jury convicted Briseno of murder, rejected his sudden passion special issue, and assessed punishment at life plus a $10,000.00 fine. The trial court sentenced him accordingly. In nine issues, Briseno challenges the trial court's judgment and complains: in issues one and two, that the trial court's exclusion of expert testimony about his mental health during guilt/innocence violated his constitutional right to present a defense; in issue three,

1

that the trial court reversibly erred by excluding expert testimony under Rule 404 during guilt/innocence, when it determined the testimony was irrelevant; in issues four and five, that the trial court committed jury charge error by failing to instruct the jury on the lesser-included offenses of manslaughter and criminally negligent homicide; in issues six through eight, that the trial court abused its discretion by admitting various photographs; and in issue nine, that the evidence was legally insufficient to support the jury's guilty verdict. As discussed below, we affirm the trial court's judgment.

## I. Background

On December 31, 2019, the evidence showed that Briseno retrieved his assault rifle from his closet and fired ten shots at his girlfriend, Khoussinov, in their bedroom after they fought over how much money he spent on a bottle of beer. Eight of those ten shots hit Khoussinov. The evidence showed that Briseno left Khoussinov lying on the floor in their bedroom, took his firearm, and went to a neighbor's home, where he admitted shooting Khoussinov. A police officer arrived and began CPR, but Khoussinov died at the scene. The evidence also showed that witnesses observed Briseno agitated and emotional after the shooting.

Before trial, Briseno did not raise insanity as a defense or file the requisite paperwork to do so. During guilt/innocence the trial court excluded evidence of Briseno's mental health which Briseno sought to introduce through a defense expert,

Dr. John Matthew Fabian and Briseno's treating counselor, Melany Morrison. During punishment, witnesses were allowed to present evidence of Briseno's mental health issues and low IQ. In punishment, the jury rejected the sudden passion special issue, then assessed punishment at life plus a $10,000 fine.

## II. Trial Evidence[1]

### A. Testimony of Kimberly Kyle

Kimberly Kyle testified that she lived on North Lynx Trail, a cul-de-sac in the Woodforest neighborhood of Montgomery County, Texas. On New Year's Eve 2019, she was home with her mother and nephew watching a movie around 7:30 p.m., and by that time, fireworks were already going off sporadically. She explained that about 8:30 or 8:45 p.m., while watching the movie, she heard "something that was not sounding like fireworks to me" and thought it did not sound right.

Kyle testified that she had heard gunshots previously. When she first heard the noise, Kyle believed someone was "outside celebrating and shooting a gun." She thought she heard six or seven gunshots. She explained how the sound of the gunshots differed from the fireworks and noted that the gunshots happened in "quick succession" that she characterized as "bam, bam, bam, bam."

---

[1]We describe the evidence adduced at trial in this section. For purposes of clarity and organization, we outline other relevant information and details of the trial court's rulings in our discussion of the respective issues below.

Kyle said that she looked out a window to see if anyone was outside and planned to call police. She said she saw a man come out of a house "shaking his head and he looked upset, and he was talking on his cell phone and then, he fell down on his knees and looked distraught, quite distraught." Kyle testified that the house she was looking at had red pillars and a red door. Although she had seen the people who lived there before, she did not know their names. Kyle estimated that the time between hearing the shots and seeing the man exit the house was about "a minute and a half to two minutes." She described the man as having a "fairly light" build, and it seemed that he lived at the house he exited from but did not recognize him in the courtroom.

Kyle said that she did not watch him long through the window, "maybe two minutes," and she thought he probably had a fight with his girlfriend. Since nobody was outside shooting a gun in the air, she decided not to call 911. Kyle explained that she did not approach the man, because she thought "they probably had a breakup" and did not want to intrude. Soon after, though, Kyle heard sirens.

**B. Testimony of Zane Hoffmeyer**

Deputy Zane Hoffmeyer with the Montgomery County Precinct 3 Constable's Office testified. In December 2019, he worked as a patrol officer for the Montgomery County Sheriff's Office. Hoffmeyer testified that on New Year's Eve 2019, he was a rookie deputy and worked the night shift.

4

Hoffmeyer testified that this call came into dispatch, and he remembered hearing an assault firearm was involved, which meant it was a "Priority 1" call, so he responded with lights and sirens. This was the first murder call that he ever responded to. As he drove to the scene, Hoffmeyer received many updates from dispatch. He explained that this incident involved two 911 callers, and sometimes information "can get a little mixed up," because you have two dispatchers relaying information into "one call," which results in "a lot of crossover information[.]" From the time he received the call to when he arrived was about ten minutes. He knew there was a shooting, and someone was possibly hurt, so his priority was to find the victim and render aid.

Hoffmeyer was the first officer to arrive, and he was alone. In 2019, they did not have body cameras, but he had a dashcam in his patrol car. The dashcam recorded his audio, which was admitted into evidence. When he arrived at the scene of the incident, his priority was finding the victim; he went inside the home, but nobody was there to help him clear the house. Hoffmeyer knocked on the door and announced, "Sheriff's Office," but nobody responded. Hoffmeyer explained that based on the call notes, he believed the shooter was at a neighbor's house.

He testified that his priority was to secure the scene and find the victim. Hoffmeyer cleared the rooms and checked the bedroom last, where he found the female victim. He found her slumped against the dresser and leaning towards the

5

bed. The lights were off, and given the furniture's configuration in the room, he could not see her when he first walked in; he had to walk around the bed and look into the back corner to see her.

Hoffmeyer's first thought was to assess her injuries, and she appeared to be bleeding heavily, so he was concerned whether she was alive. He tried to lay her flat and lifted her shirt to assess her injuries, since dispatch informed him she was shot with a crossbow. Hoffmeyer explained that he believed she was shot but not with a crossbow, because there were no arrows in the room.

He explained that he pulled her along the carpet and laid her flat in an open space to render aid. Hoffmeyer spoke to her to see if she was conscious, but she did not respond. He did not observe any weapons on her or around her. Once Hoffmeyer had her on a flat surface and lifted her shirt, he observed multiple bullet holes, which he described for the jury. He explained that he observed shell casings fired from a rifle, which was another thing that made him believe this was a shooting. He performed CPR for a "[c]ouple minutes" before EMS came in and took over. Hoffmeyer testified that she never responded, and he could not tell that she had a pulse. Hoffmeyer said his hands were bloody, because he did not have time to put gloves on. He washed his hands in a sink at the residence, and in hindsight, he would not do that again.

Hoffmeyer's dashcam video, played for the jury, showed him arriving at the scene. After he exited, the audio continued to record, and Hoffmeyer was heard entering the residence and attempting to render aid. The 911 call detail records that came through as Hoffmeyer responded to the call were also admitted into evidence and shown to the jury during his testimony. Hoffmeyer confirmed that he did not have any interactions with Briseno that night and that his only job was to render aid to Khoussinov.

## C. Testimony of Sara Bowker

The State called Sara Bowker to testify. Bowker testified that in 2019, they moved to the Woodforest neighborhood. She said that in December 2019, they had lived on North Lynx Trail for about six months. Her husband is a firefighter and works shifts of two days on then four days off. As she began testifying, a photograph of the cul-de-sac was admitted and shown to Bowker; she identified her home and the home of Briseno and Khoussinov.

On December 31, 2019, Bowker was pregnant with her first child. She was home with her parents, Natalie and Tom, that night, while her husband worked. She remembered that they watched the sitcom, Friends. Bowker explained that they turned the television volume up to drown noise from the fireworks, because one of her dogs was "petrified of fireworks." Bowker noted that the fireworks started "when it went dark" outside, and around 7 p.m., they started going off consistently.

Bowker said that Briseno, Khoussinov and Khoussinov's daughter all lived in a home together on the street. Bowker stated that she and her husband were not good friends with them but characterized the relationship as "friendly." She identified Khoussinov and her daughter in a photograph that was admitted and shown to the jury. Bowker described Khoussinov as "very reserved, very quiet." She added that Briseno and Khoussinov worked at H-E-B.

Bowker denied hearing gunshots that night. She said that about 9 p.m., someone knocked on the door. When she answered the door, Briseno was standing there wearing a white tank top and pajama pants. She stated that he was "very out of breath, very frantic[,]" and she saw something was wrong; she thought he was drunk but did not smell alcohol. He had his hand on his head and leaned on the doorframe. Bowker explained that Briseno asked if he could talk to her husband. She told Briseno her husband was not home, so Briseno asked to speak to his wife, and Bowker had to tell him that she was his wife. According to Bowker, Briseno knew that her husband was a firefighter. She agreed that her husband had EMS training. Since Bowker's husband was not there, Briseno was looking for her, but Briseno did not realize who she was, so there was some confusion. She attributed Briseno's not making sense to the broken conversation caused by his heavy breathing and "panic." Although he was emotional, Bowker did not see any tears.

Bowker testified that the weapon was up on the side of her house and fell. When she saw it on the doormat, she realized it was "an automatic" gun. She estimated that Briseno was on her porch about a minute before she saw the weapon fall. According to Bowker, at that point, Briseno said, "Something bad happened. I did something really bad. Something bad happened." Briseno identified himself as the bad actor. She said that Briseno never pointed the weapon in her direction nor threatened anyone.

Then, Bowker asked her dad to come to the door and guided him to the weapon on the ground while simultaneously guiding Briseno into her house. Bowker's father grabbed the weapon and locked it in the trunk of his car. She felt it was important to separate Briseno from the weapon, because she did not know if he was a danger to her, her parents, or himself. As he stood inside Bowker's foyer, Briseno was still "very out of breath" and almost "hyperventilating." Bowker noted that her mother is a nurse, so her mother asked Briseno if he needed water, because she thought he might be having a panic attack or was sick.

Bowker testified that she asked Briseno what was going on. Briseno responded, "Something bad happened. I did something really bad. She's dead. I killed her. She's dead." According to Bowker, she immediately asked Briseno, "Where is her daughter?" Briseno told Bowker the daughter was in San Marcos with her father. Bowker explained that Briseno was physically rocking. Bowker testified:

9

You could see he was visibly angry at himself. I feel like it wasn't about her dying. He was really mad at himself and he kept getting up and he was walking around our room. He would get in a ball in the ground. In the kitchen, he was like, Oh, my gosh. My dad is going to kill me. My dad is going to kill me. Prior to that, I guess he called his dad . . . and his dad called the sheriff's department.

Bowker stated that he was pacing and appeared uninjured. She said that all Briseno's concern was directed at himself rather than Khoussinov, and "he was visibly upset that his dad was going to be mad at him." She claimed she had seen someone behave like Briseno before when they were "very angry."

Bowker estimated that Briseno was in her house for ten or fifteen minutes. During that time, she asked him as many questions as possible. She stated that Briseno told her they were fighting about a bottle but did not say what kind, so she assumed it was alcohol. Briseno said it was about a bottle he bought for his brother, who lived overseas at the time; Bowker assumed it was an expensive bottle, so it boiled down to finances and how much Briseno spent on it.

Bowker testified that her mother called 911 from another room. When the officer arrived, Bowker went and told the officer that Briseno was in her house, and she thought Khoussinov was in one of the bedrooms. Bowker then returned to her house, where her parents were with Briseno. She said that Briseno "was freaking out" and thought that the police would do something to him, so he asked Bowker's parents to walk him down the driveway to meet the police.

**D. Testimony of Thomas Miller**

Thomas Miller, Bowker's father, also testified. He recently retired and moved to the Woodforest neighborhood near his daughter. In December 2019, he lived in Maryland, but Miller and his wife were visiting Montgomery County to visit Bowker. They arrived on December 27 and planned to leave on New Year's Day.

Like his daughter, Miller testified that he, his wife, and daughter were watching Friends that night. His son-in-law, a fireman, was working. Miller recalled that they turned the television up "really loud" since one of his daughter's dogs was anxious about the fireworks.

They heard a knock on the door about 9 p.m. then clarified that he thought it was the Ring doorbell. Miller said that when Bowker cracked the door, he saw her talking to someone from the back of the living room. Initially, Miller was unconcerned and just "assumed it was one of her friends at the door." Miller explained that changed when Bowker told him, "Dad, I need you now. Come here. Come here now. I need you."

Miller testified that as he walked to the door, Bowker opened it, and he observed Briseno standing there. He then identified Briseno in court. Miller said that night, Briseno wore a sleeveless t-shirt and pajama pants, and Miller heard, "Something bad has happened." As Briseno entered the house, Miller noticed an assault rifle across the doormat. He stated that his "first thought was, I have to secure

11

this weapon and make sure it doesn't get back into his hands." So, Miller grabbed the weapon and locked it in the trunk of his rental car.

Miller testified that he moved quickly, because he was "fearful" for his wife and daughter and wanted to get back inside the house. Once inside, he saw that Briseno, his wife, and daughter were in the living room, so he walked back there. Miller stated that Briseno "was saying things like, I can't believe this happened. Something bad has happened. I have done something bad. At the point where he said, I shot [Khoussinov], I turned to my wife and said, Go call 911 now." Miller said that he was concerned about someone potentially needing help but had his wife call, because he believed it would be safer if he stayed with Briseno. His wife "went to the front bedroom to make that call." He did not smell any alcohol on Briseno and did not see any tears coming out of Briseno's eyes. Miller heard Briseno say that he shot Khoussinov.

Miller testified that his wife reported on the 911 call that the weapon was a crossbow. He explained that his wife was behind them, so he did not believe she had a clear view of what was there. Miller was unfamiliar with assault rifles and did not know what a shoulder stock was. They did not try to determine whether it was an AK-47 or crossbow, they were simply trying to keep everyone safe and secure the weapon.

While his wife called, Miller, Bowker, and Briseno were in the kitchen/living room area, and Briseno "was very upset." Miller testified that they tried to keep Briseno calm. They could see the police lights approaching. Miller explained that Briseno became more agitated as time went on because he knew the police were coming, and once Briseno saw the lights, "he became very agitated." At one point, Miller believed that Briseno would leave the house, "but just kind of moved around the hallway." Miller confirmed that he noticed a difference in Briseno's behavior as the police lights approached, as he became more agitated and "knew they were approaching. They were coming for him." He also described Briseno's demeanor as "shocked, upset, irritated, nervous, scared." Miller did not notice Briseno breathing heavily or hyperventilating.

Eventually, Miller and his wife walked Briseno to the policeman in the cul-de-sac, with Miller on one side and his wife on the other side. At that time, Miller did not know how many times Briseno shot Khoussinov or how long it had been since he shot her.

Miller testified that Briseno never brandished the weapon in his family's direction nor threatened his family. During Miller's testimony, portions of video from State's Exhibit 11 were played for the jury, and he described what occurred as the video played. Miller confirmed that he and his wife tried to keep Briseno as calm as possible and assisted with a peaceable arrest.

13

**E. Testimony of Michael Berry**

Michael Berry testified that he is a patrol sergeant with the Montgomery County Sheriff's Office and has been with them since 2013. On New Year's Eve of 2019, Berry was a crime scene investigator ("CSI"). As a CSI, Berry said that they assist the homicide violent crimes detectives with documenting and processing crime scenes for evidence. Berry described his training and experience as a CSI.

Berry was the lead CSI on this case, but he was not alone at the crime scene and named two other CSIs, including his lieutenant, who were there. Berry said that he helped the State create a demonstrative scale model of the scene for use in the courtroom. He documented the crime scene with photographs and used accurate measuring devices to measure the location of different items of evidence, which he documented on an XY axis in his notes. He referred to those notes and believed the demonstrative model accurately represents the location of the physical evidence from the bedroom that night. Placards in the courtroom had numbers on them that corresponded to how he marked the evidence that night.

Berry testified that the demonstrative model showed the location of Khoussinov and the approximate position of her body when he arrived, and she was on her back with her left hand above her head. He confirmed there was a blood trail around the corner of the bed that went towards the dresser. He noted there was an open "large gun safe" in the closet of the bedroom.

14

He explained that the height of the bed would have been at Khoussinov's hip if she were standing. He said that the bed was on her right, the exterior wall was to her left, and the dresser was behind her. According to Berry, if a man stood in the closet doorway holding an assault rifle, and a woman stood between the bed and the dresser, for the woman, there was "[n]ot really anywhere to go." Also, he said that if, hypothetically, she was threatening with the "Jabberwocky" beer bottle shown in the photographs, she would only have one shot with it.

During his testimony, State's Exhibit 145, a photograph of the dresser containing multiple bullet perforations was admitted into evidence and shown to the jury, which he discussed. Berry testified that certain placards shown on the demonstrative model corresponded to Exhibits 112 through 121, which were ten fired shell casings. Berry stated he took photographs of Briseno at the scene, which were admitted into evidence. At least one photograph showed a small spot of "apparent blood" on Briseno's thumbnail, but Berry agreed that his hands were not obviously bloody. Other than a scrape on Briseno's shoulder, Berry did not recall him having any other obvious injuries.

Additional photographs of the Briseno home were also admitted into evidence, which Berry discussed for the jury. He testified that he collected journals as evidence and copied every page of them. Another photograph showed a beer bottle on the table. Photographs of Khoussinov's body at the scene were also

15

admitted and shown to the jury. According to Berry, these photographs accurately showed what he found at the scene, including evidence of her injuries and attempted medical intervention. Berry stated that he "documented several apparent gunshot wounds . . . from the top of her leg up through her torso and one on her arm." Berry also discussed photographs admitted into evidence that showed ten bullet casings collected at the scene. According to Berry, a photograph showed that one placard corresponded to the Jabberwocky bottle of beer in the room. Other photographs admitted during Berry's testimony and published for the jury showed additional items of evidence he collected, including photographs of the dresser with multiple bullet holes, items covered in blood, bullet fragments, and projectiles. Some perforations, fragments, and projectiles were found outside the house seemingly consistent with bullets being fired from the inside location and going through walls. Photographs of the inside of the master bedroom closet were also admitted, which Berry discussed; they showed firearms, magazines, and ammunition.

Photographs of the rifle removed from the neighbor's car, a magazine and ammunition recovered with it were also admitted and shown to the jury, which Berry described. Berry testified that as part of processing the scene, he removed the magazine from the weapon, which contained unfired cartridges. Berry explained that the photographs showed unfired hollow point projectiles in the magazine. Berry noted that in one photograph, he was showing the chamber, and he recalled "that

16

there was an unfired cartridge in the chamber of the firearm." Berry relayed that there were twenty live rounds in the weapon he recovered from the trunk, including nineteen in the magazine and one in the chamber. He stated that adding the ten fired shell casings collected in the bedroom to that twenty, you get thirty rounds, and this AK-47 assault rifle magazine had a thirty-round capacity. The weapon and magazine with the unfired cartridges were also presented to the jury during Berry's testimony.

During cross-examination, defense counsel questioned Berry about the Jabberwocky bottle found in the bedroom, and Berry agreed that a bottle can be used to injure someone. He said he tested the mouthpiece of the bottle for DNA but did not test it for latent prints. He also stated one photograph taken showed video games in the home, including the first-party shooter game, Call of Duty, and the third-party shooter game, Grand Theft Auto. Berry said that he did not observe any bruising on Briseno's shoulder consistent with holding a firearm there. Berry explained that the bullets that hit the neighbor's unoccupied house and the fence struck low, but he could not say what the initial trajectories were. He added that he could not tell where someone stood based on where casings landed.

Berry explained that the AK-47 was a "[r]elatively heavy rifle[,]" and he estimated it weighed about twelve pounds. He said the magazine added about another pound, so the total weight would be about thirteen or fourteen pounds. Berry stated that the firearm had a "sliding stock[,]" and the stock "swivels out so that it's

longer." Berry estimated the length of the firearm with that stock was close to forty-six inches, which added about a foot to the weapon. He also collected a bolt-action rifle and shotgun from the safe.

Berry discussed blood evidence seen on a light switch and on the closet door, and he noted he did not collect DNA evidence from the light switch but did from the frame on the inside of the closet door. According to the 911 call notes, "reportee's son and his girlfriend live there[,]" and "[r]eportee's son shot the girlfriend." Based on that, even if they collected all the DNA in the house and submitted it, it would not tell them anything, as he would expect both of their DNA to be on everything in the house.

## F. Testimony of Mark McKelvy

Mark McKelvy testified that he is a firearms examiner trainee at the Houston Forensic Science Center. In 2019 and early 2020, McKelvy was a private contractor for the ATF assigned to the Montgomery County Sheriff's Office. He specified that he was a technician for the National Integrated Ballistic Information Network ("NIBIN"). He explained that "NIBIN is a database for fired cartridge cases and, in some cases, bullets. It takes 2D and 3D images of cartridge cases and bullets and compares them to a designated region by that laboratory or office." McKelvy said that it was fair to compare NIBIN to the AFIS fingerprint database or CODIS DNA database. Given the right training, equipment, and experience, McKelvy said it is

possible to take an unknown spent shell casing or bullet fragment, compare it to knowns, and match them.

In 2019, as a technician, McKelvy test-fired firearms and ensured they were safe to operate and safe to test-fire. He verified whether there were working safeties, performed test-fires, and then entered them into the NIBIN database. He explained that test-firing involved going to a designated shooting room in the laboratory and shooting into a water tank designed to catch a bullet.

McKelvy testified that he was asked to work on this case. He received a firearm and ten fired cartridge cases. He confirmed that the case was assigned a unique identifying number, which the examiner receives with the items when he forwards it. McKelvy said that here, he was asked to perform a test-fire and did so; the weapon fired when he pulled the trigger. He produced a known, spent shell casing from the rifle that he entered in the NIBIN system. He explained that the casing was then stored at the assigned case number for the examiner to use later. According to McKelvy, the firearm measured 34.5 inches in the extended position and 25.25 inches in the collapsed position. McKelvy stated that he fired the gun from the extended position.

## G. Testimony of Patricia Bui

Patricia Bui testified that she is a firearm and toolmark examiner with the Montgomery County Sheriff's Office. Bui explained that "when a gun is used in an

19

incident," law enforcement "can submit the firearm, the fired bullet, the fired cartridge case," and she tries to determine whether that was the firearm used during the incident. She described her experience and training for the jury. In 2024, she began working for the Montgomery County Sheriff's Office in their firearms lab, which is accredited. Bui specified that the Montgomery County lab could make firearms comparisons and is equipped with NIBIN.

Bui outlined her duties as a firearms examiner, including performing function testing, comparative analysis, and acting as the NIBIN coordinator for Montgomery County. She said it was possible, under the right circumstances, to take unknown ballistic evidence recovered from a crime scene and compare it to known ballistic evidence, then match fired casings to a particular firearm.

Bui testified that she was asked to perform firearms function testing and comparative analysis in this case. She received the following evidence from CSI Berry: three firearms; unfired cartridge cases; a fired bullet and fragments. Bui also received a package of test-fires performed by McKelvy. When she compared the items to the test-fires, she could reach opinions about the weapon that fired some, but not all, of them. Bui said she documented her findings in a report and a photograph outlining the evidence with the conclusions, which were admitted into evidence.

She explained that she determined the AK-47 firearm was functional with no malfunctions detected during testing. Bui noted she performed three trigger pull tests and that the single-action trigger pull required 7.25 pounds, 7 pounds, and 7.25 pounds to discharge when she performed the three tests. She noted that this was a semiautomatic rifle, which only shoots one round per trigger pull. Bui said that she experienced recoil when she tested the weapon, which would make it harder for a shooter to control if shooting one-handed.

Bui testified that the safety selector on the firearm worked properly, so when the safety was engaged, the shooter must depress or release the safety before the firearm discharged. If the gun was stored with the safety off, it would not need to be disengaged, and once a round is chambered, it does not take much effort to pull the trigger. She explained that with the stock, the weapon was designed to be shot from the shoulder, which adds stability; however, it also has a pistol grip and can be shot like a normal pistol. Bui did not know if one must remove the magazine before collapsing the stock to place it in the pistol grip configuration. The accuracy at a particular distance depends on the "proficiency of the shooter."

The evidence submitted for analysis included one fired bullet, three fired bullet jacket fragments, and four lead fragments. Bui explained that she was only able to identify the fired bullet as being fired from the AK-47. She compared the pieces of evidence, but she was unable to eliminate them or identify them as being

21

fired from the weapon. Bui said that she also received ten bullet casings, which were all suitable for comparison. She stated that upon comparison, she identified those casings as being fired from the AK-47. She told the jury that the AK-47 assault rifle was a deadly weapon.

**H. Testimony of Jeremy Thomas**

Jeremy Thomas testified that he currently works for FTI Consulting, Technology Section in digital forensics. He previously worked as an investigator for the district attorney's office, and in 2023, after thirty years in law enforcement, he retired. Thomas has testified as a digital forensics' expert on many occasions before.

Thomas testified that he worked on this case. Thomas described the process of downloading cell phones. Thomas confirmed they obtained a search warrant for Briseno's cell phone, and a password was provided. He provided the numbers associated with Briseno's cell phone and Khoussinov's cell phone. Thomas said that he used Cellebrite to download Briseno's phone and "obtained a logical extraction[,]" which he described as "just what you see on the phone." Thomas ran a timeline report for December 30 and 31, 2019, that included different types of data from the phone in time order. He said they picked that timeframe because it was the day of the incident and the day before. The timeline report was admitted into evidence during Thomas's testimony. They ran a different report containing a conversation that Briseno and Khoussinov were a part of, which was also admitted

into evidence. Messages between Briseno and Khoussinov were read into the record. Thomas explained that there was no evidence of conflicts or fighting in those messages.

During Thomas's testimony, three photographs of Briseno shooting the murder weapon retrieved from his phone were admitted into evidence and shown to the jury. Thomas said the photographs showed Briseno holding and shooting the same gun used the night of the incident, which he observed when he went to the scene that night. Thomas stated he did not know when those photographs were taken, although they could obtain that information, which he would try to do. During a recess, Thomas ascertained the dates for two of the photographs and told the jury that State's Exhibit 214 was taken on January 9, 2018, and Exhibit 216 was taken on January 4, 2018. He could not find the information for State's Exhibit 215.

On cross-examination, the defense had Thomas go through the timeline report with the different messages, contacts, and activities on Briseno's phone. Thomas testified that there appeared to be Safari searching on Briseno's phone until about 8:50 p.m. on New Year's Eve. Then, Briseno's phone makes an outgoing call to "Dad" at 9:01 p.m., which lasts six minutes and twenty-eight seconds. He confirmed that the last time Briseno did anything on the phone was at 9:01 p.m. Thomas did not see a call to 911 from Briseno's phone on December 31, 2019.

23

## I. Testimony of Dr. Kathryn Pinneri

Kathryn Pinneri testified that she is a board-certified forensic pathologist and described her medical education and training for the jury. She is the Director of Montgomery County Forensic Services in Conroe, Texas, and their office oversees and performs autopsies ordered by the justice of the peace in Montgomery County. Pinneri outlined what an autopsy consists of, including the internal and external examinations; she also takes photographs and x-rays.

On January 1, 2020, Pinneri performed Khoussinov's autopsy. Pinneri testified that she prepared a report of the autopsy she performed on Khoussinov. The trial court admitted autopsy photographs over defense objection, which they addressed previously outside the jury's presence. According to Pinneri, apart from the injuries noted in her autopsy report, Khoussinov was healthy.

Pinneri began by discussing the x-rays. Pinneri discussed the x-rays admitted into evidence and pointed out projectile fragments spread through Khoussinov's body, including her left chest, abdomen, left chest area, and lumbar vertebrae, for the jury. Pinneri stated that Khoussinov had "extensive fracturing of the left arm near the shoulder[,]" and "extensive fracturing of both sides of the pelvis[.]"

Pinneri identified eight different gunshot wounds (GSWs), which she noted in the autopsy report. She could not say the order in which the wounds occurred. Pinneri used the autopsy photographs to describe the gunshot wounds, the damage

24

they did to Khoussinov's body, and the paths of the projectiles. Pinneri explained how various photos showed entrance versus exit wounds and how she distinguishes those.

Pinneri testified that GSWs 1, 6, 7, and 8 were survivable. She explained that GSWs 2 and 3 were close together on the left breast and upper chest area. Pinneri noted that GSW 2 fractured multiple ribs, and caused "extensive damage to the heart," which she characterized as "pulpification" that obliterated large portions of the heart. It then went through the left lung, left side of the diaphragm, the stomach, and fractured two more ribs. She stated that GSW 2 was not survivable. Pinneri noted the exit wound for GSW 2 and identified it in photographs. She said that the path of GSW 3 was "almost identical" to GSW 2. Pinneri explained that GSW 3 likewise fractured ribs, "pulpifies the heart[,]" and perforates multiple other internal organs, like the left lung, diaphragm, and stomach. She opined that GSW 3 was painful and not survivable. GSW 4 entered the front of the body near the right breast, passed through the lung, heart, and liver, transected the aorta and left kidney, perforated the stomach and spleen, then exited her lower back. Ultimately, she opined that GSWs 2, 3, and 4 were fatal in and of themselves.

Pinneri described recovering projectile fragments and collecting them for firearm examiners. Pinneri testified that all wounds traveled front to back; some wounds were downward, some straight through, and one was slightly upward. She

25

conveyed that all Khoussinov's wounds were consistent with being shot with an assault-style weapon from ten to twelve feet away. She stated that an AK-47 assault rifle was a deadly weapon capable of causing serious bodily injury or death, and firing an AK-47 at someone is an act clearly dangerous to human life. Pinneri opined that the cause of death was multiple gunshot wounds to the torso, left arm, and left leg, and the manner of death was homicide.

Pinneri explained during cross-examination that she did not find any firearm residue or see any stippling, so the shooter was more than two to three feet away. She did not know what order the shots were fired.

**J. Testimony of Michael Wright**

The defense called Michael Wright, who testified that he is an investigator for the Montgomery County District Attorney's Office and previously worked for the Montgomery County Sheriff's Office. Wright testified that he was familiar with and able to inspect the AK-47 assault rifle involved in this case. He described this gun as a "Soviet style" weapon.

Wright test fired the rifle and made a video of him doing so, which was admitted into evidence and played for the jury. The video showed that he fired the weapon ten times in less than seven seconds, which Wright said was not unusual. Wright explained that each time he fired the weapon, he shot ten rounds, because that was the number of shots fired during the commission of the offense. Wright test

fired the weapon indoors and outdoors. He explained that in the video, he fired the weapon with the shoulder stock extended in a hip-flair position. Although the weapon was not designed to be fired from the hip, it can be done effectively. Wright believed that it would be unusual for someone to have bruising from recoil if the rifle were fired properly with the stock extended. According to Wright, if ten shots were fired with the rifle with eight hitting the target, that would be effective fire, and he considered that managed recoil.

## K. Additional Witnesses

During guilt/innocence two friends and Briseno's family members testified about his nonviolent character. These witnesses included friend Evan Fritz, who was Briseno's friend and coworker at H-E-B from 2018 through 2019. He also knew Khoussinov from working at H-E-B. Fritz testified that Briseno did not have violent behavior or nature. Bianca Arbello, another friend of Briseno's testified. Arbello said that she had known Briseno for seventeen years, and they met in middle school then attended high school together. Arbello stated that Briseno was "very sweet, generous, very courteous[,]" and "[n]onviolent."

Christopher Briseno, the defendant's older brother, testified.[2] He said that Briseno is his youngest brother, and they "are pretty close." According to

---

[2]For purposes of clarity, we refer to Briseno's family members by their first names.

Christopher, he, Briseno, and their other brother, Eric, share an interest in craft beer. Christopher stated that he believed Briseno was nonviolent. He agreed, though, that Briseno pulled the trigger and did not believe that someone else shot Khoussinov eight times. Christopher believed that such a violent act was inconsistent with Briseno's nonviolent nature.

Eric Briseno testified that he is Briseno's oldest brother. He currently lives in Magnolia, near The Woodlands, but in 2019, he lived in Norway but planned to move back around the time this happened. Eric said that he and Briseno have "always been close[.]" According to Eric, Briseno was nonviolent. That said, he believed Briseno held the rifle that killed Khoussinov.

Tommy, Briseno's father, testified. He said that he has three sons, Eric, Christopher, and Mark. Tommy shared that Briseno, Khoussinov, and her daughter lived together in the home in Woodforest. Tommy said that Briseno and Khoussinov were together about two years. He noted that they closed on their house in August 2019, and in September 2019, he and Briseno shopped for an engagement ring online.

Tommy testified he received a call at 9:01 p.m. from Briseno on New Year's Eve 2019. Tommy was home with his wife and mother when he received the call, which he answered. He explained that Briseno was "crying and frantic," and he could not understand parts of what Briseno said, "because it was screaming and crying."

Tommy claimed he had never heard Briseno sound like that before. Tommy learned the source of frustration when Briseno told Tommy what happened. Tommy stated that Briseno said, "I shot Daria." He explained that during the six-minute call, he tried to get information from Briseno, and it seemed like "he was trying to say something," but Tommy "couldn't tell what it was." According to Tommy, "It was a lot of crying and I couldn't understand what all he was saying[.]" Briseno eventually hung up, but Tommy told him, "Stay put. Stay there." Tommy said that he immediately called 911." He agreed that after receiving his son's call, his emotions were all over the place.

After he called 911, Tommy drove to Briseno's house. When Tommy arrived, his son was already under arrest. Tommy met with the detectives, provided his information, and did what he could to cooperate. According to Tommy, Briseno is "not a violent person." He explained that he was unaware of Khoussinov being violent and knew her to be kind, respectful, a good mom, and a hard worker.

Cynthia Briseno also testified for the defense. Cynthia said that she lives with her husband, Tommy, and with Briseno. On New Year's Eve 2019, she lived with Tommy and her mother-in-law. Cynthia discussed a series of text messages and stated that she invited Briseno over for New Year's Eve to eat, but he declined since he had to work the next day. She explained that later that evening, her husband received a phone call, and she observed that he was "scared," and "nervous." Cynthia

29

and her mother-in-law were also scared and did not know what was going on but believed there may have been a car accident. She stated that Tommy called the police then went to Briseno's house, while she stayed with her mother-in-law. According to Cynthia, Briseno had a reputation for being nonviolent.

## L. Other Evidence

Two different 911 calls were played for the jury. The first was from Natalie Miller, who was visiting her daughter, Sara Bowker, a resident on the same street at 265 North Lynx Trail. She relayed that a neighbor showed up at her daughter's house with a "crossbow" and said that he hurt his girlfriend, but the caller did not know what he had done to her. She reported that his name maybe was "Mark." Natalie said that the man dropped the crossbow on the front porch, and her husband picked it up and secured it in their car, because they weren't sure what he would do. The 911 operator said that the police were already on the way, because the man's father also called 911 to report it. The caller did not know if he shot his girlfriend with the crossbow. Natalie reported that her husband was still inside with the man, and at one point, the man was trying to leave. The second 911 caller was Briseno's father, Tommy. He provided the address of 253 North Lynx Trail and requested an ambulance and police; he reported that there was a shooting at that location, and his son's girlfriend was injured. Tommy reported that his son, Briseno, told him that he shot his girlfriend, and they had been arguing. Tommy said his son was "frantic,"

and he did not know what he would do. Tommy relayed that the shooting happened within the last five minutes but did not know what Briseno shot her with.

### III. Expert Testimony and Mental Health Evidence

During a pretrial hearing, Briseno conceded that he had not filed the requisite "notice of intent" to use the insanity defense and that "we do not intent [sic] to say he was insane at the time of the offense." Nevertheless, the defense argued that evidence of Briseno's mental health was relevant to his intent at the time of the offense under Texas Code of Criminal Procedure article 38.36(a). The defense sought to have two expert witnesses testify during guilt/innocence, Dr. John Fabian and Melany Morrison. The State asserted that under article 38.36, to be relevant during the guilt phase of trial, the evidence of mental health must (1) negate the "intentionally or knowingly" mens rea (i.e., to negate intent), and (2) "pass muster under Rule 403." The State contended evidence of Briseno's mental health did not do so. Briseno responded that to convict him of murder, the State must prove he did so "intentionally or knowingly[,]" and if the defense "can show a lower mental state, which would reduce his criminal culpability, we should be able to say, [o]kay. Maybe he didn't do it intentionally. Maybe he was reckless. Maybe this happened with criminal negligence." The trial court determined they would have to approach at the appropriate time and address it in context.

31

The trial court conducted two hearings pertaining to these witnesses, their qualifications, and the admissibility of their testimony. Briseno's counsel asserted they wanted to introduce evidence of his mental health, which it claimed impacted the mens rea in this case. In addition to citing multiple cases, Briseno argued that to deny him the opportunity to defend himself violates the United States Constitution whether that is the Due Process Clause, the Fourteenth Amendment, or compulsory process of the Confrontation Clause under the Sixth Amendment. The defense also contended that the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. Briseno claimed that if he was not allowed to rebut an element the State had to prove, it impacted on his ability to put on a defense.

We address the details of these hearings and the trial court's rulings in our discussion of issues one and two below.

### IV. Jury Charge and Verdict

The trial court denied Briseno's request to instruct the jury on the lesser-included offenses of manslaughter and criminally negligent homicide. The jury convicted Briseno of murder as alleged in the indictment. After rejecting the sudden passion special issue in punishment, the jury assessed punishment at life plus a $10,000 fine.

## V. Issue Nine: Sufficiency of the Evidence

In issue nine, Briseno complains that the evidence is insufficient to support the jury's guilty verdict, "because there is no evidence Appellant acted intentionally or knowingly or with the unlawful intent to cause serious bodily injury." In essence, he contends that his statements and behavior were inconsistent with an intent to cause death or serious bodily injury. We address this issue first, since if meritorious, it would entitle him to rendition and judgment of acquittal. *See Benavidez v. State*, 323 S.W.3d 179, 181 (Tex. Crim. App. 2010) (explaining appellate courts render judgment of acquittal only if trial court's ruling amounts to *de facto* acquittal or appellate court determines evidence was legally insufficient to support conviction); *O'Reilly v. State*, 501 S.W.3d 722, 726 (Tex. App.—Dallas 2016, no pet.) (addressing legal sufficiency issues first, because if meritorious, court would render judgment of acquittal).

### A. Standard of Review and Applicable Law

In evaluating legal sufficiency of the evidence, "we consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Garcia v. State*, 667 S.W.3d 756, 761 (Tex. Crim. App. 2023) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf*

*v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, we defer to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See Hooper*, 214 S.W.3d at 13 (citation omitted); *see also Edwards v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021) (citation omitted). As factfinder, the jury is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by the parties. *Metcalf*, 597 S.W.3d at 855 (citations omitted). We do not reweigh the evidence or determine the credibility of the evidence, nor do we substitute our judgment for the factfinder's. *See McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted); *see also David v. State*, 663 S.W.3d 673, 678 (Tex. Crim. App. 2022) (citations omitted) (explaining that appellate courts consider the "combined and cumulative force of all the admitted evidence in the light most favorable to the verdict").

In our sufficiency analysis, we must identify the essential elements of the crime that the State must prove; in doing so, "we examine 'the hypothetically correct

34

jury charge for the case.'" *Dunham v. State*, 666 S.W.3d 477, 482 (Tex. Crim. App. 2023) (citing *Clinton v. State*, 354 S.W.3d 795, 799 (Tex. Crim. App. 2011); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). A hypothetically correct charge "(1) accurately sets out the law, (2) is authorized by the indictment, (3) does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and (4) adequately describes the particular offense for which the defendant was tried." *Id.* (citing *Ramos v. State*, 407 S.W.3d 265, 269 (Tex. Crim. App. 2013)) (other citation omitted). "The 'law as authorized by the indictment' includes the statutory elements of the offense and those elements as modified by the indictment." *David*, 663 S.W.3d at 678–79 (quoting *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000)).

A person commits murder if he "intentionally or knowingly causes the death of an individual;" or if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(1)–(2). Texas Penal Code section 6.03 defines culpable mental states. *See id.* § 6.03. "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* §

35

6.03(a). A specific intent to kill can be inferred from the use of a deadly weapon, here a firearm. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Intent may also be inferred from circumstantial evidence such as acts, words, and the conduct of the appellant."); *Wilkerson v. State*, 881 S.W.2d 321, 324 (Tex. Crim. App. 1994) (concluding jury could infer appellant's intent to kill from how he handled his weapon, the pressure needed to fire the weapon, the distance from which he fired, the injury he inflicted, and his flight from the scene); *Vuong v. State*, 830 S.W.2d 929, 934 (Tex. Crim. App. 1992) (quoting *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986) ("'The specific intent to kill may be inferred from the use of a deadly weapon, unless in the manner of its use it is reasonably apparent that death or serious bodily injury could not result.'")). A firearm is per se a deadly weapon. *See* Tex. Penal Code Ann. § 1.07(17)(A).

**B. Analysis**

Here, the indictment alleged that "Briseno, on or about December 31, 2019, . . . did then and there, intentionally or knowingly cause the death of an individual, namely: Daria Khoussinov, by shooting her with a firearm," or that he "did then and there intend to cause serious bodily injury to Daria Khoussinov, . . . and did cause the death of [Khoussinov] by intentionally and knowingly committing an act clearly dangerous to human life, to wit: shooting the complainant with a deadly weapon, namely a firearm[.]" So, under a hypothetically correct jury charge, Briseno

36

committed murder if he intentionally or knowingly caused Khoussinov's death by shooting her, or if he intended to cause serious bodily injury and committed an act clearly dangerous to human life by shooting her, resulting in her death. *See id.* § 19.02(b)(1)–(2); *see also Dunham*, 666 S.W.3d at 482; *Malik*, 953 S.W.2d at 240.

Briseno challenges the evidence supporting the requisite culpable mental state of intentionally or knowingly and points to his panic and distress after the shooting as evidence that he did not have the requisite intent. *See* Tex. Penal Code Ann. § 19.02(b)(1)–(2). Each fact need not point to Briseno's guilt, as long as the cumulative force of the evidence and reasonable inferences does. *See David*, 663 S.W.3d at 678; *Balderas*, 517 S.W.3d at 766. Briseno's argument ignores the other evidence in the record and the deference we afford the jury in its fact-finding role to weigh that evidence and draw reasonable inferences therefrom. *See Edwards*, 635 S.W.3d at 655; *Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13; *see also McPherson*, 677 S.W.3d at 664.

While we agree that multiple witnesses described Briseno's distress after the shooting, other evidence supports a reasonable inference by jurors that his conduct was intentional or knowing. *See Guevara*, 152 S.W.3d at 50; *Wilkerson*, 881 S.W.2d at 324; *Vuong*, 830 S.W.2d at 934. The evidence supporting this inference of Briseno's intentional or knowing culpable mental state includes the following: (1) Briseno had to open a gun safe and retrieve his firearm; (2) he may have had to

disengage the safety; (3) Khoussinov was cornered in their bedroom; (4) at least seven pounds of pressure was required to depress the trigger and fire; (5) he fired ten rounds and hit her eight times, three of which were individually fatal; (6) he shot from relatively close range; (7) he had to manage the firearm's recoil; (8) he left her lying on the floor; and (9) he did not call 911. *See Guevara*, 152 S.W.3d at 50; *Wilkerson*, 881 S.W.2d at 324; *Vuong*, 830 S.W.2d at 934. Viewing all the evidence in the light most favorable to the jury's verdict, we conclude the jury could have reasonably inferred that Briseno had the requisite intentional or knowing mental state, and the evidence was legally sufficient to support his conviction for murder. *See Jackson*, 443 U.S. at 318–19; *Garcia*, 667 S.W.3d at 761. We overrule issue nine.

### V. Issues One and Two: Constitutional Right to Present a Defense

In issues one and two, Briseno complains that the trial court violated his constitutional right to present a complete defense by excluding evidence of his mental health during guilt/innocence, specifically from forensic psychologist and neuropsychologist Fabian and from licensed professional counselor Morrison. *See* U.S. CONST. amend. V, VI, XIV; Tex. Const. art. I, § 19, art. I, § 10. In issue one he complains that Fabian's testimony regarding Briseno's mental health was relevant to negate mens rea and excluding this evidence impacted his right to present a

38

defense. In issue two, he asserts that the trial court erred by excluding Morrison's testimony about his mental health, which impacted his right to present a defense.

## A. Relevant Background, Daubert Hearings, and Trial Court's Rulings

### 1. John Fabian

In a hearing on the admissibility of Fabian's testimony outside the jury's presence, Fabian testified that he has a doctorate in clinical and forensic psychology as well as a juris doctorate, although he does not practice law. The State stipulated to his qualifications to render certain opinions, and his CV was admitted for purposes of the hearing.

Fabian explained he was familiar with relevant case law regarding his ability to testify about the "mens rea elements[.]" Fabian testified that two cases addressed his ability to testify as an expert in Texas and cited *Jackson v. State*, 160 S.W.3d 568 (Tex. Crim. App. 2005), and *Ruffin v. State*, 270 S.W.3d 586 (Tex. Crim. App. 2008). According to Fabian, he has testified in "few to several cases" in Texas courts trying to rebut the mens rea element.

Fabian explained that the defense contacted him in late 2022 to examine Briseno "related to his mental state at the time of this alleged offense and to assist in conceptualizing the case from that point of view as to mental state defenses and potential mitigating circumstances that the jury could consider," and to address "heat of passion or sudden passion issues." In evaluating Briseno, Fabian reviewed the

following information: police reports; witness statements; dashcam videos; officer videos from the scene; Briseno's interrogation video; Briseno's mental health records; various letters; 404(b) and prior bad acts evidence from the prosecution; the prosecutor's interview with Briseno's ex-girlfriend; and other collateral witness testimony. He testified that he based his opinion on the totality of the information he reviewed, in addition to his educational background and forensic background.

Fabian opined that Briseno has several psychiatric diagnoses related to mental illness, including "other specified depressive disorder, other specified trauma and stressor related disorder, which is relevant to some symptoms or features of PTSD, post-traumatic stress disorder." He also testified that Briseno "has evidence of other specified personality disorder with borderline features[,]" and "evidence of an alcohol use disorder and an unspecified neurodevelopmental disorder, . . . related to a disorder of early brain development." Fabian said those mental health factors impacted his opinion about whether on December 31, 2019, Briseno had the conscious objective or desire to engage in conduct or to knowingly engage in conduct or intend the results of his conduct.

Generally, in terms of how those diagnoses affect someone's ability to perceive a situation, Fabian explained that "there are a combination of psychiatric and neuropsychiatric symptoms," and "there is a combination of borderline personality features" that typically involve a "history of deficits in relationships, so

volatility in relationships, emotions, reactions, difficulties with, at times, anger impulsivity and the impulsivity can be seen in different areas." He noted that these individuals generally "may experience issues related to feelings of abandonment" and feeling more sensitive with their emotions than the average person, "[s]o, sensitivity to rejection, sensitivity to abandonment can be debilitating to an individual." He also testified that regarding sensitivity to criticism and rejection, individuals "in more serious cases, would have potential evidence of a dissociative-type episode that they could have a snap or rage component where they may have an out of mind/body type experience[.]" He stated that these factors impacted his opinion about whether Briseno acted with the requisite mens rea, although he did not explain how they did so for Briseno specifically. Fabian instead spoke in generalities and terms of "may" and "can be." According to Fabian, "they can, essentially, snap and have a rageful event that they lack insight of conscious awareness." Fabian opined that a dissociative-type episode directly relates to the required mens rea element that the defendant must have at the time of the offense. Regarding Briseno, Fabian testified it was consistent with dissociation and said, "There was a void, and there was confusion, attempts to make meaning of what happened." He noted Briseno's dialogue with others, his continued confusion, and "lack of real knowledge, conscious awareness of certain aspects of that moment of what occurred."

During cross-examination, the State asked Fabian what witnesses he talked to about Briseno's state of mind on the night of the offense. Fabian said that he reviewed the police video and spoke with Briseno about his recollection. He stated that he interviewed Briseno twice—on January 29, 2023, and on March 11, 2023. Fabian testified that he reviewed and summarized law enforcement records, including witnesses like Natalie Miller, Sara Bowker, Thomas Miller, and Tommy Briseno but did not feel the need to follow up further with them. That said, he conceded they all described Briseno's state of mind after the murder. Likewise, Fabian revealed that the video he reviewed in the back of the car and Briseno's in-custody interview occurred after the murder. Fabian testified that he did not talk to anyone who spoke to Briseno or spent time with him that day before the shooting. At the time of the hearing, Fabian stated that he had not prepared a report but prepared "a note summary without an opinion."

The State also asked whether all Briseno's diagnoses negated mens rea, to which Fabian responded with a question, "What is the mens rea intent you are trying to prove?" He then explained that Briseno does not know what happened at that moment, so in his opinion, "there's evidence of a dissociative state, then that would be relevant to his intent at that moment." Fabian opined that "Briseno's ability to form intent at that moment was compromised in a dissociative rage and there was evidence of the [e]ffect of alcohol and he has evidence of brain dysfunction." Fabian

agreed that it made Briseno volatile, angry, impulsive, sensitive to rejection, snappy, and rageful.

The State argued that this case was like *Cortez v. State*, in which Fabian offered testimony of a dissociative state to negate intent or knowledge in a murder case, but the Austin Court of Appeals held that testimony did not negate intent. *See* No. 03-18-00751-CR, 2020 WL 6495107 (Tex. App.—Austin Nov. 5, 2020, no pet.) (mem. op., not designated for publication). The State asserted that the Austin Court reasoned that Fabian's testimony was "general" and "did not, specifically, provide any context or any information to the Court that would negate any sort of intent in this case." It contended that the evidence is a way to excuse the defendant's behavior in this case rather than being "put forward to negate mens rea, intent or knowledge." The State noted that Fabian was hired to address sudden passion and potential mitigation, which was appropriate for punishment, not guilt, under applicable case law.

The defense countered that Fabian's testimony of what he found could directly relate and rebut mens rea. It argued that if the Court found it could negate mens rea and lead to a lesser-included offense, the evidence comes in. The Defense argued that the State conceded to Fabian's qualifications under Rules 702 and 705, so if the evidence directly relates to or rebuts mens rea, then the court performs a 403 balancing test. The defense argued it hoped to get to the lower mental state of

"recklessly" and because under *Ruffin v. State*, his state of mind is relevant in a murder case, it should be able to offer professional testimony about his state of mind. The defense also argued that Fabian relied extensively on Briseno's mental health record between 2013 and 2019, and there is evidence in this case that at the time of the offense, Briseno did not remember the details of the shooting. The defense also stated Briseno's behavior after the fact is important, claiming it reflected someone who was confused, dissociated, and upset.

Regarding a lesser included offense, the State argued that there was no testimony about a reckless state of mind, and there was no fact issue put forward, particularly by the expert, that would raise a lesser included offense in this case. The defense responded that if any evidence could justify a lesser included charge, then it should be considered. The trial court did not rule immediately and instead considered the case law the parties provided but ruled later that day Fabian could not testify during guilt/innocence.

The next day, the defense officially "called" Fabian to testify, and the State again objected that the testimony was irrelevant evidence of diminished capacity. The trial court sustained the objection and excluded Fabian's testimony during guilt/innocence.

44

**2. Melany Morrison**

In a separate hearing outside the jury's presence to determine the admissibility of her testimony, Morrison testified that she is a licensed professional therapist. She described her educational background, including receiving a master's degree in Marriage and Family Therapy in 2005. Morrison noted she was on the Mobile Assessment Team ("MAT") that traveled in four counties to emergency rooms and ICUs to assess whether a person needed to be discharged to hospitalization or if they could go home. She saw thousands of patients as part of that team. Morrison testified that Briseno was her client. She explained that she provided records to Briseno upon his request and in response to a grand jury subpoena but recently located additional records from 2013 in a shred pile, which they discussed during the hearing.

Morrison explained that Briseno's first meeting on January 23, 2013, was an intake meeting set up through H-E-B's Employee Assistance Program (EAP). Briseno reported "suicidal" feelings. Although this concerned her, she determined he did not have a plan, intent, or the means to do it; so, he did not meet the criteria for hospitalization. She noted that a couple of days later, on Friday, January 25, 2013, Briseno called and reported having "homicidal" thoughts. Morrison again determined that he did not meet the criteria for hospitalization, but she took it seriously.

Morrison described their next appointment on January 31, 2013, in which Briseno said that he "walked out of work." She noted that he felt "overwhelmed at work," he had "trouble tolerating large crowds[,]" and became anxious. Morrison said that they addressed coping skills and setting goals. Morrison saw him February 2013, then he did not return until September 2013, when he reported feeling "snappy and irritable." They discussed him having an external locus of control and taking more personal responsibility.

He resumed visits with her in 2015 and completed a new intake form. Morrison noted in October 2015 that he still suffered from an "adjustment disorder;" they also discussed managing stress. She testified that in November 2015, Briseno expressed concern about how others perceived him.

Morrison testified that in January 2019, Briseno reported that he saw a psychiatrist who diagnosed him with "soft bipolar," and she noted that was not a real diagnosis but determined he received a Bipolar II diagnosis. Her last visit with Briseno was on January 29, 2019, about a year before the shooting, and he presented as "dysphoric," which she explained meant something was not quite right. Briseno also relayed that he was in a new relationship with a new lady who had a daughter.

When asked whether Briseno's noted disorders and diagnosis could impact his ability to be aware of the consequences of his actions, Morrison answered, "I can't speculate to that." When asked again about someone's awareness with these

46

disorders, she responded that "everybody is different." She also testified that one's ability to recall was not connected with being bipolar. Morrison denied ever being afraid of Briseno and could not speculate on what happened. Morrison stated that Briseno did not meet the criteria for hospitalization, and even on his worst day, "there was no hospital that would take him." She testified that she had no idea what Briseno's mental state was the day of the murder.

After Morrison testified, the defense contended that Morrison treated Briseno before the shooting, and she was never afraid of him, which was relevant under Rule 401. The State noted Morrison's testimony that she believed he was not a candidate for hospitalization and that she had no idea about Briseno's state of mind the day of the murder. The State objected to Morrison's testimony being admitted during guilt/innocence. The trial court ruled Morrison's testimony was irrelevant during guilt/innocence and would not come in at that phase. Morrison's records were admitted for purposes of the record.

## B. Standard of Review and Applicable Law

We review a trial court's ruling admitting or excluding evidence of a defendant's mental illness for an abuse of discretion. *See Jackson*, 160 S.W.3d at 574. "A trial court abuses its discretion if its decision lies outside the zone of reasonable disagreement." *State v. Heath*, 696 S.W.3d 677, 688–89 (Tex. Crim. App. 2024) (citations omitted). We do not substitute our decision for the trial court's if

the decision lies within the zone of reasonable disagreement. *See id.* at 689; *Resendiz v. State*, 112 S.W.3d 541, 544 (Tex. Crim. App. 2003).

In murder prosecutions, "the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing . . . together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." Tex. Code Crim. Proc. Ann. art. 38.36(a). Texas does not recognize a diminished capacity defense other than insanity. *See Mays v. State*, 318 S.W.3d 368, 381 (Tex. Crim. App. 2010); *Ruffin*, 270 S.W.3d at 593; *Jackson*, 160 S.W.3d at 573. "The defendant's right to present a defense generally includes the due process right to the admission of competent, reliable, exculpatory evidence to rebut any of those elements." *Ruffin*, 270 S.W.3d at 594. A trial court need not admit any expert testimony concerning appellant's mental illness during the guilt stage if it does not directly rebut his culpable mens rea. *See Mays*, 318 S.W.3d at 382; *Ruffin*, 270 S.W.3d at 596. Even if the evidence directly rebuts a defendant's culpable mental state, it must also meet Rule 403's requirements. *See Ruffin*, 270 S.W.3d at 595. Under Rule 403, a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

## C. Analysis

### 1. Fabian

Briseno argues that Fabian's testimony and Morrison's testimony about his mental illnesses directly negated the required mens rea for murder and was thus admissible under article 38.36(a) and *Ruffin v. State*. *See* 270 S.W.3d at 586. We first address Fabian's testimony. We note that before trial, Briseno conceded he did not file the requisite notice of intent to enter a plea of not guilty by reason of insanity nor did he intend to claim that defense. *See* Tex. Penal Code Ann. § 8.01 ("It is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong."). Yet, he argued that Fabian's testimony was relevant to intent, as it could provide evidence of a reduced culpable mental state such as "reckless" or "criminal negligence." The State repeatedly argued such evidence was not relevant during guilt or innocence, as it did not directly negate intent, and it objected based on Rule 403. The defense argued it was relevant and urged the court to perform a Rule 403 balancing test.

When the State asked whether all Briseno's diagnoses negated mens rea, Fabian responded with a question, "What is the mens rea intent you are trying to prove?" He then explained that Briseno does not know what happened at that moment, so in his opinion, "there's evidence of a dissociative state, then that would

49

be relevant to his intent at that moment." When asked directly whether Briseno "was fundamentally incapable of forming intent on the day of the offense[,]" Fabian opined that "Briseno's ability to form intent at that moment was compromised in a dissociative rage and there was evidence of the [e]ffect of alcohol and he has evidence of brain dysfunction." Fabian testified that those conditions made Briseno volatile, angry, impulsive, sensitive to rejection, snappy, and rageful.

Fabian equivocated when testifying during the hearing, and he even questioned what "mens rea intent" the State was trying to prove before opining that Briseno's ability to form intent was "compromised."[3] The defense did not elicit testimony from Fabian clarifying what he meant by "intent" after he questioned its meaning nor did it elicit testimony about how this "dissociative rage" compromised Briseno's ability to engage in conduct intentionally or knowingly. *See Vinson v. State*, 252 S.W.3d 336, 340 (Tex. Crim. App. 2008) (recognizing proponent's burden of establishing the admissibility of the proffered evidence). Fabian's testimony seemingly offered more of an explanation for why Briseno reacted the way that he

---

[3]After the trial court excluded his testimony during guilt/innocence, Fabian answered more directly when allowed to testify during the punishment phase. Specifically, defense counsel asked Fabian if he had "an opinion about whether he [Briseno] was in a dissociative state or a state that was described to you by Mr. Briseno?" Fabian responded, "*No*. I believe that he had evidence of a dissociative episode pursuant to these borderline personality features that has to do with him snapping, and I believe alcohol is part of it." (Emphasis added.)

did, attributing his volatility, anger, impulsivity, sensitivity, and rage to the combinations of his conditions, brain dysfunction, and alcohol.

Although the defense contended that the testimony was relevant to a reduced culpable mental state, during the hearing Fabian did not offer any testimony that would have explained how Briseno's conduct was reckless or criminally negligent as opposed to intentional or knowing. In other words, he never testified that Briseno did not know he was shooting at an individual repeatedly or that he was shooting at Khoussinov specifically or was unable to perceive that pointing and shooting a loaded gun at someone was dangerous. During the hearing, Fabian never explained how evidence of a dissociative rage impacted Briseno such that rather than acting intentionally or knowingly, he acted with the lesser culpable mental state of either recklessness or criminal negligence. Absent evidence that (1) Briseno was unable to intentionally or knowingly shoot Khoussinov or (2) testimony explaining how a dissociative rage meant Briseno acted recklessly or with criminal negligence considering these specific facts—that he retrieved a weapon from a safe and fired ten shots at Khoussinov while she was backed into a corner—Fabian's testimony regarding Briseno's mental illness also risked confusing the issues and misleading the jury. *See* Tex. R. Evid. 403.

Considering the record, the trial court was within the zone of reasonable disagreement to conclude that Fabian's testimony concerning Briseno's mental

51

illness did not directly rebut his culpable mens rea or explain how it meant that he acted recklessly or with criminal negligence. *See Mays*, 318 S.W.3d at 382; *Ruffin*, 270 S.W.3d at 596; *see also Heath*, 696 S.W.3d at 688–89. The trial court could also have reasonably concluded that the evidence risked confusing the issues and misleading the jury and thus was inadmissible under Rule 403. *See* Tex. R. Evid. 403; *Ruffin*, 270 S.W.3d at 595. Therefore, the trial court did not abuse its discretion by excluding Fabian's testimony during the guilt/innocence phase. *See Jackson*, 160 S.W.3d at 574 (noting abuse of discretion standard); *see also Mays*, 318 S.W.3d at 382; *Ruffin*, 270 S.W.3d at 596.

We conclude that the trial court properly excluded evidence that did not directly negate mens rea or concluded that such evidence risked confusing the issues and misleading the jury in violation of Rule 403, and the defendant's constitutional right to present a defense was not compromised. *See Davis v. State*, 313 S.W.3d 317, 329 n.26 (Tex. Crim. App. 2010) (explaining that constitutional right to "meaningful opportunity to present a complete defense " is qualified by requirement that defendant's evidence be relevant and not excluded by established evidentiary rule); *Renteria v. State*, 206 S.W.3d 689, 697 (Tex. Crim. App. 2006) (concluding that admission of constitutionally relevant evidence is not required if it is otherwise objectionable under state law).We overrule issue one.

## 2. Morrison

Briseno similarly argues the trial court erred by excluding his counselor, Morrison's, testimony during guilt/innocence. Morrison's testimony was even more attenuated than Fabian's. Morrison described her treatment of him over many years, which Briseno contends was evidence necessary to explain his actions and behavior witnessed by Kyle, Bowker, and Miller just moments after the shooting when he went to Bowker's home in an erratic and frantic manner. That said, Morrison specifically denied having any insight into Briseno's mental state at the time of the shooting. Given Morrison's testimony that she could not offer evidence of Briseno's mental state when the shooting occurred, the trial court likewise was in the zone of reasonable disagreement to conclude that her testimony concerning Briseno's mental illness did not directly rebut his culpable mens rea. *See Mays*, 318 S.W.3d at 382; *Ruffin*, 270 S.W.3d at 596; *see also Heath*, 696 S.W.3d at 688–89. Therefore, we further conclude that the trial court did not abuse its discretion by excluding Morrison's testimony during the guilt/innocence phase. *See Jackson*, 160 S.W.3d at 574 (noting abuse of discretion standard); *see also Mays*, 318 S.W.3d at 382; *Ruffin*, 270 S.W.3d at 596. Having properly excluded Morrison's testimony of Briseno's mental illness during guilt/innocence, the trial court did not violate his constitutional right to present a defense. *See Davis*, 313 S.W.3d at 329 n.26; *Renteria*, 206 S.W.3d at 697. We overrule issue two.

53

## VI. Issue Three: Exclusion of Expert Testimony Under Rule 404

In his third issue, Briseno complains that the trial court abused its discretion when it excluded evidence of a relevant character trait from Morrison, a mental health professional. Briseno complains Morrison's testimony she was not afraid of him was admissible under Texas Rule of Evidence 404 as relevant character evidence of his nonviolent nature.

At the conclusion of Morrison's testimony during the hearing to determine whether her testimony would be admitted during guilt/innocence, Briseno argued that she worked with him from 2013 through 2019. He argued that she testified she was unafraid of him and "that it's relevant under 401."

In a criminal case, as an exception to the general rule that character evidence is inadmissible, a defendant may offer evidence of a pertinent character trait. *See* Tex. R. Evid. 404(a)(2)(A). We observe that Briseno never argued in the trial court that the evidence was admissible under Rule 404. To preserve a complaint for appellate review, a party must show it complained to the trial court by a timely request, objection, or motion and provided the stated grounds for the ruling sought with sufficient specificity to make the trial court aware of the complaint. Tex. R. App. P. 33.1(a)(1)(A). "[I]t is not enough to tell the judge that evidence is admissible.  The proponent, if he is the losing party on appeal, must have told the judge why the evidence was admissible." *Reyna v. State*, 168 S.W.3d 173, 177 (Tex.

Crim. App. 2005). Thus, the complaining party on appeal must have "brought to the trial court's attention the very complaint that party is now making on appeal." *Id.* (citation omitted). In other words, an appellant's complaint on appeal must comport with his complaint in the trial court. *See id.*; *see also Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009).

At trial, Briseno merely argued that the evidence was relevant under 401 to show that Morrison was not afraid of him. He did not argue that the evidence was admissible under Rule 404(a) to show his character for nonviolence. Since Briseno contends on appeal that Morrison's testimony was admissible for a reason he did not raise in the trial court, he has failed to preserve this complaint for our review. *See* Tex. R. App. P. 33.1(a)(1)(A); *Pena*, 285 S.W.3d at 464; *Reyna*, 168 S.W.3d at 177. We overrule issue three.

## VII. Issues Four and Five: Jury Charge

In issue four, Briseno contends that the trial court erred when it refused to instruct the jury on the lesser-included offense of manslaughter. In issue five, he argues that the trial court also erred by refusing to instruct the jury on the lesser-included offense of criminally negligent homicide. During the charge conference, Briseno requested these instructions. He cites the testimony of various witnesses who stated after the shooting he was distraught, frantic, panicked, and breathing heavily, which he contends "are not consistent with an intent to cause death or

55

serious bodily injury." He also points to the fact that "the weapon was fired in an erratic pattern in an extremely short period of time."

## A. Standard of Review and Applicable Law

We review a trial court's refusal to submit a lesser-included instruction for an abuse of discretion. *See Chavez v. State*, 666 S.W.3d 772, 776 (Tex. Crim. App. 2023). Here, a lesser-included offense is one which "differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission." Tex. Code Crim. Proc. Ann. art. 37.09(3). We use a two-step test to determine whether an instruction on a lesser-included offense should be given. *See Ritcherson v. State*, 568 S.W.3d 667, 670 (Tex. Crim. App. 2018); *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012); *Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007). First, we compare the statutory elements of the alleged lesser offense with the statutory elements and indictment's descriptive allegations. *Ortiz v. State*, 623 S.W.3d 804, 806 (Tex. Crim. App. 2021) (citing *Ritcherson*, 568 S.W.3d at 670–71). Second, we ask "whether 'there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense.'" *Id.* (quoting *Bullock v. State*, 509 S.W.3d 921, 925 (Tex. Crim. App. 2016)). This second step requires (1) evidence directly refuting or negating other evidence establishing the greater offense and raising the lesser-included offense, or (2) evidence susceptible to different interpretations, one of

56

which refutes or negates an element of the greater offense and raises the lesser offense. *Ritcherson*, 568 S.W.3d at 671.

Evidence raising the lesser offense must be affirmatively in the record. *Id.* "[A] defendant is not entitled to a lesser-included offense instruction based on the absence of evidence, and the evidence must be 'directly germane to the lesser-included offense[.]'" *Id.* (citing *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997)). We consider all the evidence admitted at trial, and if more than a scintilla of evidence raises the lesser offense and negates or rebuts an element of the greater offense, the defendant is entitled to a lesser-charge instruction. *Id.*; *Roy v. State*, 509 S.W.3d 315, 317 (Tex. Crim. App. 2017). Whether the evidence is controverted or credible does not matter. *Ritcherson*, 568 S.W.3d at 671. In determining whether Briseno had the intent to murder or only caused Khoussinov's death recklessly or with criminal negligence, the sole question "is whether a jury could have reasonably interpreted the record in such a way that it could find Appellant guilty of only" manslaughter or criminally negligent homicide. *See id.* at 676.

As noted in our sufficiency analysis, a person commits murder if he "intentionally or knowingly causes the death of an individual," or if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(1)–(2). In

57

contrast, a person commits manslaughter if he "recklessly causes the death of an individual." *Id.* § 19.04(a). A person acts recklessly when he is "aware of but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." *Id.* § 6.03(c). A person commits criminally negligent homicide if, with criminal negligence, he causes the death of an individual. *Id.* § 19.05(a). A person commits a criminally negligent act "when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(d).

Manslaughter and criminally negligent homicide are lesser-included offenses of murder. *See Cavazos*, 382 S.W.3d at 384 (addressing manslaughter as a lesser-included); *Cardenas v. State*, 30 S.W.3d 384, 392 (Tex. Crim. App. 2000) (recognizing criminally negligent homicide as lesser-included offense of murder). The State concedes this first step of the analysis. At issue here is the second step of the analysis and "whether 'there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense.'" *Ortiz v. State*, 623 S.W.3d at 806. This second step requires (1) evidence directly refuting or negating other evidence establishing the greater offense and raising the lesser-included offense, or (2) evidence susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense. *Ritcherson*, 568 S.W.3d at 671.

**B. Analysis**

**1. Manslaughter**

We turn first to manslaughter. In *Cavazos v. State*, the Court of Criminal Appeals determined that where a defendant pulled a firearm in a crowded room and shot the victim twice, he was not entitled to a lesser-included charge of manslaughter. *See Cavazos*, 382 S.W.3d at 380. Cavazos asserted there was no evidence he intentionally fired the gun at the victim, and because his conduct constituted mere recklessness, he was entitled to the manslaughter instruction. *Id.* at 385. In rejecting his argument, the Court of Criminal Appeals reasoned that "[p]ulling out a gun, pointing it at someone, pulling the trigger twice, fleeing the scene (and the country), and later telling a friend 'I didn't mean to shoot anyone' does not rationally support an inference that [he] acted recklessly at the moment he fired the shots." *Id.* The Court recognized that the record must contain "more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Id.* In other words, the evidence produced must be sufficient to establish the lesser-included offense is a "valid, rational alternative" to the charged offense. *Id.* (citation omitted).

Here, "mere speculation" is all that Briseno has alluded to for support of his claim on appeal. Briseno points to multiple witnesses' testimony about how Briseno acted after he shot his girlfriend, and that they described him as upset, panicked,

distraught, and frantic. He also asserts that the gun was fired erratically. Briseno's being upset after the fact does not negate his intent at the time he shot and killed his girlfriend, and it is founded on mere speculation. Rather, the evidence adduced at trial established he retrieved the gun from the gun safe, may have had to disengage the safety, fired ten times at Khoussinov while she was cornered in the room, and hit her with eight of those shots. Despite being upset, he also admitted to witnesses that he killed Khoussinov. Moreover, as to his claim that the shots were fired erratically, we see no such evidence in the record. Rather, Investigator Wright testified that a person hitting another individual eight out of ten shots required managing recoil with this weapon. Here, no evidence suggests that Briseno fired inadvertently as he waved the gun around or performed some other reckless act. *See* Tex. Penal Code Ann. § 19.04(a). Since the kind of evidence "that both raises the lesser-included offense and rebuts or negates an element of the greater offense[]" is missing in this record, the trial court did not abuse its discretion in declining to charge the jury manslaughter. *See Cavazos*, 382 S.W.3d at 385; *see also Chavez*, 666 S.W.3d at 776. We overrule issue four.

### 2. Criminally Negligent Homicide

In support of issue five, Briseno contends that evidence showed he was criminally negligent. He asserts there was evidence he did not leave during an argument, handled a high-powered weapon and pointed it at the complainant while

60

intoxicated, and failed to perceive how the potential outcome of these actions could result in Khoussinov's being shot multiple times.

In the context of criminally negligent homicide, criminal negligence means that the defendant should have known of the risk surrounding his conduct but failed to perceive it. *See* Tex. Penal Code Ann. §§ 6.03(d), 19.05(a). While we agree that evidence showed that Briseno did not leave, handled a high-powered weapon and pointed it at Khoussinov while he was intoxicated, we disagree that there was any evidence in the record that he failed to perceive that taking these actions could result in Khoussinov's being shot. Briseno's being frantic after the fact would still require us to speculate about what he perceived at the time he acted. Rather, evidence undisputedly established that he was familiar with guns and had to take specific steps, including firing at her multiple times in a fashion that managed recoil, and hitting her with eighty percent of the shots. Even if he attempts to use voluntary intoxication as a defense in that it impacted his ability to perceive that Khoussinov could have been shot, we note that voluntary intoxication is not a defense to the commission of the offense. *See id.* § 8.04. Here, there is no evidence that Briseno was unaware of the risk his actions posed to Khoussinov's safety despite his assertion to the contrary. *See Espinosa v. State*, 899 S.W.2d 359, 365 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd). We hold that absent affirmative evidence Briseno was unaware of the risk his actions posed to Khoussinov's safety, the trial court did not abuse its

61

discretion by denying Briseno's requested lesser-included offense instruction on criminally negligent homicide. *See* Tex. Penal Code Ann. §§ 6.03(d), 19.05(a); *Chavez*, 666 S.W.3d at 776 (stating standard of review); *Espinosa*, 899 S.W.2d at 365; *see also Cavazos*, 382 S.W.3d at 380 (explaining no affirmative evidence existed that did not require speculation in context of manslaughter). We overrule issue five.

## VIII. Issues Six, Seven, and Eight: Admission of Photographs

In issues six through eight, Briseno complains that the trial court abused its discretion by admitting photographs of him with the AK-47 (State's Exhibits 214–16) and certain autopsy photographs (State's Exhibits 185, 188–89). In issues six and seven he complains that the photographs with him holding the weapon were (1) irrelevant, and (2) the probative value of the photographs was outweighed by the prejudicial impact. In support of these issues, he cites Texas Rules of Evidence 401, 402, and 403. *See* Tex. R. Evid. 401–03. In issue eight, Briseno asserts that probative value of the autopsy photographs was outweighed by danger of unfair prejudice, and the trial court should have excluded them under Rule 403. *See id.* 403.

## A. Standard of Review and Applicable Law

We review a trial court's admission of photographs for an abuse of discretion. *See Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009) (analyzing in context of Rule 403 objection); *Paredes v. State*, 129 S.W.3d 530, 539 (Tex. Crim.

App. 2004). A trial court does not abuse its discretion in admitting photographs when its ruling lies within the zone of reasonable disagreement. *Heath*, 696 S.W.3d at 688–89; *Young v. State*, 283 S.W.3d 854, 874 (Tex. Crim. App. 2009). "A photograph is generally admissible if verbal testimony about the matters depicted in the photograph is also admissible." *Paredes*, 129 S.W.3d at 539 (citation omitted). "Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself." *Parker v. State*, 727 S.W.3d 38, 71 (Tex. Crim. App. 2025) (internal quotations omitted) (citation omitted). "Changes rendered by the autopsy process are of minor significance if the disturbing nature of the photograph is primarily due to the injuries caused by the appellant." *Hayes v. State*, 85 S.W.3d 809, 816 (Tex. Crim. App. 2002) (citation omitted).

Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Tex. R. Evid. 401. Rule 402 states the general rule that relevant evidence is admissible, and irrelevant evidence is inadmissible. *See id.* 402. Under Rule 403, even relevant evidence can be excluded if the trial court determines, among other things, that its probative value is substantially outweighed by its prejudicial effect. *See id.* 403. Rule 403 requires photographs to possess some probative value and that the inflammatory nature does not substantially outweigh that value. *Williams*, 301 S.W.3d at 690. "In deciding whether photographs are

63

unfairly prejudicial, we must also consider the following factors: the number of photographs, the size, whether they are in color or black and white, whether they are gruesome, whether any bodies are clothed or naked, and whether a body has been altered by autopsy." *Prible v. State*, 175 S.W.3d 724, 734 (Tex. Crim. App. 2005); *see also Williams*, 301 S.W.3d at 690.

**B. Analysis**

### 1. Photographs of Firearm

Two of the complained-of photographs showed Briseno holding the weapon with the firearm against his shoulder, and the other showed the weapon lying on the ground. Briseno complains they are irrelevant, and the probative value is outweighed by unfair prejudice and danger of confusing the jury. At trial, initially, the dates the photographs were taken could not be determined, yet it was later determined that two of them were taken about two years before the shooting. The trial court admitted them, though, before the date had been determined.

Even so, the photographs showed that Briseno was familiar with using the firearm, had previously fired the weapon rested against his shoulder, and the other photograph showed a closeup of the weapon, including the safety mechanism. Given the defense's argument that he was reckless or criminally negligent, these photographs went to prove his familiarity with the weapon, that he knew how to use it, which could have been useful in determining he was aware of the risks associated

64

with the firearm. Additionally, at trial, the defense attempted to show that Briseno did not fire this weapon from his shoulder, and if he had, he would have been bruised. The photographs showed that Briseno had experience firing the weapon from his shoulder. The trial court could have reasonably determined they were relevant. *See* Tex. R. Evid. 401. Considering the relevant factors, the complained-of photographs were only three in number, they were not gruesome, and they were in color. The trial court could have likewise reasonably concluded that the probative value of the photographs showing Briseno shooting the weapon and of the weapon lying on the floor was not substantially outweighed by the prejudicial effect. *See Williams*, 301 S.W.3d at 690; *Prible*, 175 S.W.3d at 734; *see also* Tex. R. Evid. 403. Thus, we hold the trial court did not abuse its discretion by admitting State's Exhibits 214–16. *See Williams*, 301 S.W.3d at 690; *Paredes,* 129 S.W.3d at 539. We overrule issues six and seven.

### 2. Autopsy Photographs

In his eighth issue, Briseno argues the trial court erred by admitting autopsy photographs (State's Exhibits 185, 188, and 190) over his objection, because the probative value was outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403. He asserts that because the photographs were not published or discussed with any witness, they had no probative value. The State concedes the graphic nature of the photographs. The photographs show close-ups of Khoussinov's nude body: (1)

65

with an entrance and exit wound near her left hip; (2) with an entrance wound in her front left thigh; and (3) from behind with multiple exit wounds.

The trial court could have reasonably determined that even though these specific exhibits were not discussed by the forensic pathologist or other witnesses on the stand, they were probative of the locations of the GSWs from angles not depicted in other photographs, the number of bullet wounds, and where the bullets entered and exited. *See Williams*, 301 S.W.3d at 690; *Prible*, 175 S.W.3d at 734; *see also* Tex. R. Evid. 403. Further, these photographs showed what Pinneri described in her testimony and could have helped the jury orient themselves to other photographs Pinneri discussed. *See Paredes*, 129 S.W.3d at 539 (explaining that photographs are generally admissible if verbal testimony about the matters depicted is also admissible). Finally, the photographs did not show mutilation caused by the autopsy itself but showed the result of the injuries Briseno inflicted on Khoussinov and were highly probative for that purpose. *See Parker*, 727 S.W.3d at 71; *Hayes*, 85 S.W.3d at 816.

The trial court was within the zone of reasonable disagreement to determine that the probative value of the complained-of autopsy photographs was not substantially outweighed by the risk of unfair prejudice. *See* Tex. R. Evid. 403; *Heath*, 696 S.W.3d at 688–89; *Young*, 283 S.W.3d at 874. Therefore, we hold the trial court did not abuse its discretion by admitting the complained-of autopsy

66

photographs. *See Williams*, 301 S.W.3d at 690; *Paredes*, 129 S.W.3d at 539. We overrule issue eight.

## IX. Conclusion

Having overruled each of Briseno's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON<br>Chief Justice

Submitted on February 10, 2026
Opinion Delivered May 27, 2026
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.